

# SUPREME COURT OF MISSOURI
## en banc

EMILEE WILLIAMS,           )
                                         )
       Appellant/Cross-Respondent,     )
                                           )

v.                                               )       No. SC96547

MERCY CLINIC
SPRINGFIELD COMMUNITIES,
f/k/a ST. JOHN'S CLINIC, INC.,

       Respondent/Cross-Appellant.

*Opinion issued January 15, 2019*

## APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY
### The Honorable Mark Powell, Judge

Emilee Williams brought a medical malpractice action against Mercy Clinic Springfield Communities and Dr. Elene Pilapil.[1] Williams alleged Dr. Pilapil, and by association Mercy, negligently failed to diagnose and treat her for Wilson's disease, a rare genetic disorder that causes an excess of copper to slowly accumulate in the vital organs. A jury returned a verdict in favor of Williams. The circuit court entered judgment on the verdict for a total amount of $28,911,000 and allocated a portion of the

---

[1] Before trial, Williams dismissed Dr. Pilapil without prejudice.

future medical damages to periodic payments in accordance with section 538.220.2.[2] Williams appeals, and Mercy cross-appeals.

The application of section 538.220.2 is unconstitutional as applied to Williams because payment of future medical damages at a different interest rate than the interest rate used to compute the present value of the jury's award deprives Williams of the full value of the award and violates her due process rights. Further, because Mercy's April 27 motion to amend the judgment to remove post-judgment interest was not filed within 30 days of the entry of judgment, the circuit court did not have authority to amend the judgment to remove post-judgment interest. The circuit court's judgment is reversed to the extent it deprived Williams of the full value of the jury's award, violating her due process rights, and to the extent it sustained the untimely April 27 motion to amend striking post-judgment interest. The case is remanded for entry of a new judgment in accordance with this opinion. In all other aspects, the judgment is affirmed.

## Background

Williams, a 19-year-old woman, started seeing a counselor in 2011 for anxiety and depression. She also consulted with her primary care physician, who ordered lab tests showing Williams had elevated levels of liver enzymes and diagnosed her with mononucleosis. In October or November 2011, Williams began experiencing a change in her personality and an increase in anxiety and depression. Her primary care physician diagnosed her with anxiety and depression and prescribed Prozac.

---

[2] All statutory references are to RSMo 2000, unless otherwise specified.

Williams developed a tremor in her hand in December 2012 and first saw Dr. Pilapil, a doctor of internal medicine. Dr. Pilapil performed a neurological exam and concluded Williams did not have a neurological issue. Dr. Pilapil diagnosed her with anxiety and depression and increased her Prozac dosage.

The next month, Williams had a follow-up appointment with Dr. Pilapil. There were no changes in medication or diagnosis, and Dr. Pilapil did not perform a neurological exam. Williams visited Dr. Pilapil a third time in May 2013, after her condition had continued to deteriorate. Her tremors were worse, her voice was elevated, her fifth finger extended outward, and her lip occasionally curled up involuntarily. Dr. Pilapil lowered the Prozac dosage. At the end of May, Williams and Dr. Pilapil exchanged emails regarding Williams' worsening symptoms. Dr. Pilapil told Williams to stop taking Prozac and prescribed a different antidepressant, Celexa.

Williams visited Dr. Pilapil for the last time on June 28. At this time, Williams had trouble standing, had fatigue, could not write properly, and her fifth finger extended outward. Dr. Pilapil again stated she believed the symptoms were caused by anxiety. Dr. Pilapil continued the Celexa prescription and added Klonopin. Williams requested an MRI.

Williams and Dr. Pilapil exchanged emails during July regarding Williams' symptoms. Williams eventually asked Dr. Pilapil to schedule an appointment with a neurologist and order an MRI or CT scan. Dr. Pilapil said she would order an MRI.

Williams received an EEG at the end of the month. At this time, Williams' hands and feet were clawing, her lips were curling out, and she was unable to continue physical

3

therapy school. Williams again contacted Dr. Pilapil and requested an MRI. At the beginning of August, Williams received an MRI, which showed significant brain trauma appearing to be Wilson's disease.

Williams consulted doctors at the Wilson's Disease Center for Excellence at the University of Michigan. The doctors prescribed Trientine, an aggressive chelating agent that removes excess copper from the body but can cause additional neurological degradation. Williams' health continued to decline, and the doctors ordered Williams to stop taking Trientine. Williams was essentially paralyzed for approximately two and a half years. She was not able to walk, talk, or move, and she blinked her eyes to communicate.

Since then, Williams has made significant improvements. She is able to talk and can walk with a limp. But her personality changed significantly, as she is prone to outbursts and has not been left unsupervised since August 2013. Williams filed suit, alleging Dr. Pilapil, and by association Mercy, negligently failed to diagnose and treat her for Wilson's disease.

The jury returned a verdict in favor of Williams for the total amount of $28,911,000. The jury awarded $511,000 for past medical and wage loss, $1 million for past non-economic damages, $21 million for future medical damages, $3.2 million for future wage loss, and $3.2 million for future non-economic damages. The circuit court entered judgment, which mirrored the jury's verdict and included post-judgment interest. Mercy moved to set aside the judgment to hear evidence about the application of section 538.220.2, seeking to have the future medical damages paid in periodic payments.

4

Williams opposed the motion, arguing section 538.220.2 is unconstitutional as applied to her because payment of future medical damages at the statutorily required interest rate, when the jury had discounted the award to present value using a higher interest rate, effectively deprives her of the full value of the jury's award and violates due process.

The circuit court held an evidentiary hearing regarding the periodic payment of future damages. Williams' counsel submitted a proposed judgment, which the court entered on March 20. The judgment still included an award of post-judgment interest and extracted the attorney's fees from the amount to be paid periodically.

On April 7, Mercy filed post-trial motions to amend the judgment, for new trial, for remittitur, and for judgment notwithstanding the verdict. On April 27, Mercy filed another motion to amend the judgment, objecting to the inclusion of post-judgment interest. Williams moved to strike the April 27 motion as untimely because it was filed more than 30 days after judgment was entered. The circuit court heard argument on the pending motions.

The circuit court entered an amended judgment on June 23, sustaining Mercy's second motion to amend and striking the post-judgment interest. It also modified the future periodic payments schedule by increasing that amount to $10 million at an interest rate of 1.2%, and it was silent as to the payment of attorney's fees. Williams appealed, and Mercy Clinic cross-appealed.[3]

---

[3] This Court's jurisdiction is proper pursuant to article V, section 3 of the Missouri Constitution because this appeal involves the question of the constitutional validity of section 538.220. This Court has jurisdiction over other issues raised because, once jurisdiction attaches, it extends to all issues in the case. *In re Estate of Austin*, 389 S.W.3d 168, 170 n.9 (Mo. banc 2013).

*I. Constitutional Validity of Section 538.220.2*

Williams argues the application of section 538.220.2 to her case violates her due process rights because it permits periodic payment of future medical damages at a different interest rate than was employed to compute the present value of the jury's award.

**Standard of Review**

The challenge to the constitutional validity of a statute is subject to *de novo* review. *Watts v. Lester E. Cox Med. Ctrs.*, 376 S.W.3d 633, 637 (Mo. banc 2012). A statute is presumed valid and will be found constitutional unless it clearly contravenes a constitutional provision. *Id.* The party challenging the statute's constitutionality has the burden of proving the statute "clearly and undoubtedly" violates the constitution. *Id.*

**Analysis**

Williams argues that allocating $10 million of her future medical damages to periodic payments at the low interest rate of 1.2% – after the damages award had been reduced to present value – violates her due process rights because it effectively deprives her of the full value of the jury's award.

The general purpose of chapter 538 is to reduce the cost of medical malpractice, and the specific purposes of section 538.220 are to spread that cost over time, to guard against squandering the judgment, and to reduce future burdens on government social services. *Watts*, 376 S.W.3d at 646 (citing *Vincent by Vincent v. Johnson*, 833 S.W.2d 859, 867 (Mo. banc 1992)). Section 538.220.2 provides, in part:

6

> At the request of any party to such action made prior to the entry of judgment, the court shall include in the judgment a requirement that future damages be paid in whole or in part in periodic or installment payments if the total award of damages in the action exceeds one hundred thousand dollars. . . . *The court shall apply interest on such future periodic payments at a per annum interest rate no greater than the coupon issue yield equivalent, as determined by the Federal Reserve Board, of the average accepted auction price for the last auction of fifty-two-week United States Treasury bills settled immediately prior to the date of the judgment.* The judgment shall state the applicable interest rate.

(Emphasis added). The portion of this statute emphasized above makes clear that, when requiring future damages to be paid periodically, the circuit court cannot use an interest rate higher than the statutorily required rate. *See Watts*, 376 S.W.3d at 647 (Section 538.220.2 "requires that payments be spread out in equal payments over the recipient's life expectancy and determined by reference to a particular interest-rate benchmark. It takes from the court and the parties the opportunity to agree upon a different interest rate and payment schedule.").

Prior to the circuit court's consideration of the applicability of allocating periodic payments pursuant to section 538.220.2, the trier of fact is required to discount the future medical damages to present value pursuant to section 538.215. While section 538.220.2 designates a maximum interest rate for future periodic payments, section 538.215 does not provide a specific interest rate but provides such rate is determined by the trier of fact.[4]

---

[4] Section 538.215 provides, in pertinent part:

> 1. In any action against a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services, any damages found shall be itemized by the trier of fact as follows:

7

The jury heard testimony from Williams' economic expert regarding the amount of money she needed to fund her life care plan. The expert explained the dollar amounts he provided accounted for medical inflation and were reduced to present value. He stated that in order to fully fund the future medical damages, Williams would need $17,758,161 today, which would require the jury to award her $21 million to cover her fees and expenses. After hearing this testimony, the jury awarded Williams $21 million in future medical damages.[5] The circuit court allocated $10 million of the future medical damages to periodic payment at a 1.2% interest rate, in accordance with section 538.220.2.[6]

    (1) Past economic damages;
    (2) Past noneconomic damages;
    (3) *Future medical damages*;
    (4) Future economic damages, excluding future medical damages; and
    (5) Future noneconomic damages.

    2. *All future damages which are itemized as required by subsection 1 of this section shall be expressed by the trier of fact at present value.*

(Emphasis added).

[5] One of Williams' economic experts presented figures to the jury that were already reduced to present value, and the jury relied upon the discounted figures in determining the future medical award. At a post-trial hearing, another one of Williams' economic experts testified the per annum interest rates used to calculate the present value figure presented to the jury ranged between .74% and 5.18% over Williams' 57-year life expectancy. The expert stated that for 55 of the 57 years, an interest rate greater than the statutorily required rate was used for the calculation of the present value figure. According to the expert, for this reason, use of the statutorily required interest rate for periodic payments resulted in a reduction of the value of Williams' award. The expert further testified that if Williams' entire future medical damages award were to be paid periodically at the statutorily required interest rate, she would need an award of approximately $40 million, rather than the $17,758,161 figure heard by the jury, to fully fund her life care plan.

[6] According to the United States Department of Treasury website, the coupon issue yield equivalent of the average accepted auction price for the last auction of 52-week United States Treasury bills settled immediately prior to June 23, 2017, was 1.21. *Daily Treasury Bill Rates Data*, U.S. DEP'T TREASURY, https://www.treasury.gov/resource-center/data-chart-

Williams argues the application of section 538.220.2 in her case, after the jury discounted her future medical damages to present value, violates article I, section 10 of the Missouri Constitution because it deprives her of the full damages she was awarded. Article I, section 10 provides that "no person shall be deprived of life, liberty, or property without due process of law." Due process requires a law to be rationally related to a legitimate state interest. *Doe v. Phillips*, 194 S.W.3d 833, 845 (Mo. banc 2006). The State's legitimate interests in section 538.220.2 are reducing the cost of medical malpractice, spreading the cost over time, and reducing the burden on government social services. *See Watts*, 376 S.W.3d at 646. But the application of section 538.220.2 in this case is not rationally related to these interests. Applying section 538.220.2 here, after the jury discounted the award to present value, deprived Williams of the full value of the jury's award. The $10 million of Williams' future medical damage award to be paid periodically was effectively discounted twice – once by the jury when it reduced the entirety of the future medical damage award to present value and again when the $10 million in future periodic payments was subjected to the arbitrarily low statutory interest rate.[7] Subjecting the $10 million to future periodic payments at a different interest rate than was used to reduce the future medical damages results in Williams receiving less

---

center/interest-rates/Pages/TextView.aspx?data=billRatesYear&year=2017 (last visited Jan. 11, 2019).

[7] It is conceivable that the interest rate requirement of section 538.220.2 could be constitutional when applied to a different set of facts. For example, had the circuit court in its discretion allocated a lesser amount to periodic payments in a way that would not deprive Williams of the full value of the jury's award, the allocation of future medical damages to periodic payments at the statutorily required interest rate would not violate due process.

than the jury awarded her. Section 538.220.2 is unconstitutional as applied to Williams.[8]

Accordingly, the judgment is reversed and the case is remanded. The circuit court is

directed to enter a new periodic payment schedule that ensures Williams will receive the

full benefit of the jury's award for future medical care.[9]

### II. Lump Sum Payment Under Section 538.220.2

Mercy argues the circuit court erred in not assigning all $21 million of the future

medical damages to periodic payments in its amended judgment because the circuit court

misinterpreted section 538.220.2 and this Court's holding in *Watts*. The court assigned

$10 million of the future medical damages to be paid in periodic payments. Mercy asks

this Court to "clarify *Watts* as holding that, while the trial court has discretion to consider

the specific medical needs of a plaintiff, if there is no showing by the plaintiff that such

needs will not be met, all future medical damages must be assigned to periodic payments

pursuant to section 538.220.2, and the trial court abuses its discretion in failing to do so."

### Standard of Review

Entry of, or refusal to enter, a periodic payment schedule is reviewed for abuse of

discretion. *Sanders v. Ahmed*, 364 S.W.3d 195, 206 (Mo. banc 2012); *Vincent by*

---

[8] In *Watts*, the Court held section 538.220.2 was facially constitutional, interpreting the statute as allowing the circuit court to consider the facts of the particular case to decide what portion of future medical damages should be paid in lump sum. *Watts*, 376 S.W.3d at 647. The Court did not analyze whether the statute's interest rate requirement was unconstitutional. *Id*. In fact, the Court expressed concern regarding the interest rate requirement. *Id*. at 648. The Court stated that when the jury discounts future medical damages to present value, full compensation for those damages requires the use of a consistent future damages interest rate. *Id*. The Court reversed and remanded for the circuit court to enter a new periodic payment schedule. *Id*.
[9] Because this Court finds section 538.220.2 unconstitutional as applied to Williams, it need not address Williams' argument that the circuit court abused its discretion in requiring $10 million of the future medical damages to be paid periodically at a 1.2% interest rate.

*Vincent*, 833 S.W.2d at 866. "A trial court will be found to have abused its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Watts*, 376 S.W.3d at 637 (quoting *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 760 (Mo. banc 2010)).

**Analysis**

In *Watts*, the Court emphasized that while section 538.220.2 "takes from the court and the parties the opportunity to agree upon a different interest rate and payment schedule," "it does not remove from the court its authority to determine what part of the future medical damages shall be subject to the payment schedule, for the first sentence of section 538.220.2 expressly applies to all future damages, and no portion of the statute addressing future medical damages removes this authority from trial courts." *Id.* at 647.

In *Watts*, the defendant argued that under section 538.220, all future medical damages should be paid pursuant to a future payment schedule. *Id.* The Court disagreed, emphasizing the statute grants the circuit court discretion to determine "whether to award future medical damages wholly in periodic payments or in part in a lump sum." *Id.* In making this decision, the Court recognized circuit courts should be given discretion in considering the needs of the plaintiff and the facts of the particular case. *Id.* As the Court stated, "Some injured parties may require surgery or other extensive care in the period immediately following trial, while others may have only minimal immediate medical needs because their condition is chronic or the onset of some symptoms will not reach their peak for some years." *Id.*

11

Mercy asks this Court to hold that a circuit court abuses its discretion when it fails to allocate all future medical damages to periodic payments pursuant to section 538.220.2 when there is no showing by the plaintiff that his or her medical needs require payment in a lump sum. This would not be a clarification of *Watts* but an expansion. Neither section 538.220 nor *Watts* requires the Court to make a finding of a plaintiff's "immediate medical need." This Court declines to extend *Watts* yet reaffirms the holding in *Watts* to the extent the circuit court, under section 538.220.2, has the discretion to determine whether to award future medical damages wholly in periodic payments or in part in a lump sum. When deciding what portion of the future medical damages should be paid in lump sum, the circuit court operated under the assumption that the 1.2% statutory interest rate would be applied. There was conflicting evidence regarding whether subjecting the entire future medical award to periodic payments at the statutory interest rate would allow Williams to receive the full amount needed to fund her life care plan.[10] The circuit court considered all the evidence, including how the applicable interest rate affected Williams' ability to fund her life care plan, when it determined whether a portion of the future medical damages should be paid in lump sum. All fact issues not specifically set out in the judgment are presumed as having been found in accordance with the judgment.

---

[10] At the post-judgment hearing, the court heard evidence from Mercy's expert who explained that if future medical damages were paid periodically, Williams would receive surpluses over the amount necessary to cover her attendant care needs for the first 48 years of the payment plan, totaling approximately $5.5 million. Conversely, Williams' expert opined that periodic payments under section 538.220.2 were problematic because the statutory interest rate was much lower than the one she used to calculate present value at trial. She stated that if all of the future medical damages were subjected to periodic payments at the statutorily required rate, Williams would be approximately $40 million short of what she needs to fund her life care plan.

Rule 73.01. The circuit court did not abuse its discretion in not assigning all $21 million of the future medical damages to periodic payments.

### III. Attorney's Fees

Williams argues the circuit court erred pursuant to section 538.220.4 because the amended judgment was silent as to the payment of attorney's fees. She contends the circuit court should have required the attorney's fees to be subtracted from her future medical damages and paid in lump sum at the time of judgment before the circuit court decided how much of the future medical damages were to be subject to periodic payments.

**Standard of Review**

The interpretation of a Missouri statute is a question of law that this Court reviews *de novo*. *McGuire v. Kenoma, LLC*, 447 S.W.3d 659, 662 (Mo. banc 2014). When there is no factual dispute, statutory application is also reviewed *de novo*. *Id.*

**Analysis**

Section 538.220.4 provides:

> If a plaintiff and his attorney have agreed that attorney's fees shall be paid from the award, as part of a contingent fee arrangement, it shall be presumed that the fee will be paid at the time the judgment becomes final. If the attorney elects to receive part or all of such fees in periodic or installment payments from future damages, the method of payment and all incidents thereto shall be a matter between such attorney and the plaintiff and not subject to the terms of the payment of future damages, whether agreed to by the parties or determined by the court.

While the statute is clear there is a presumption attorney's fees will be paid at the time the judgment becomes final, the statute does not indicate whether a portion of the fees

13

should be paid in part by deducting them from the amount subject to future periodic payments or whether the fees should be paid in full from the lump sum damages when the lump sum award is large enough to cover the fees. Further, while other parts of section 538.220 direct the circuit court to make certain other specifications in the judgment, the statute does not require the circuit court to address the payment of attorney's fees. In fact, section 538.220.4 provides that "the method of payment and all incidents thereto shall be a matter between such attorney and the plaintiff."

A handful of Missouri cases have examined this issue. *See Vincent by Vincent*, 833 S.W.2d at 866 (citing section 538.220.4 for the proposition that "absent the attorney's agreement, attorney's contingent fees will be paid at the time of judgment"); *Long v. Mo. Delta Med. Ctr.*, 33 S.W.3d 629, 646 (Mo. App. 2000) (holding the circuit court properly interpreted section 538.220.4 as requiring attorney's fees to be paid when the judgment becomes final), abrogated on other grounds by *State Bd. of Registration for the Healing Arts v. McDonagh*, 123 S.W.3d 146 (Mo. banc 2003); *Baker v. Guzon*, 950 S.W.2d 635, 648 (Mo. App. 1997) (holding the circuit court did not err in entering an order that first deducted attorney's fees from the future damages award before ordering periodic payments). No case requires a judgment to explicitly provide for the method of payment of attorney's fees.

Here, the circuit court's amended judgment does not explicitly mention attorney's fees.[11] Of the $28,911,000 in damages Williams was awarded, $18,911,000 is to be paid

_____

[11] The pertinent part of the judgment states: "The remaining $10,000,000 is to be paid in periodic payments, monthly, for 696 months (58 years), plus interest of 1.20% per annum. Monthly

14

in lump sum. Williams' attorney's fees are $11,564,400. Williams' lump sum award is more than enough to cover the attorney's fees at the time of judgment. Williams' attorneys have the option to elect to receive part or all of their fees in periodic or installment payments, as the payment of these fees is between Williams and her attorneys. The circuit court did not err in entering its amended judgment that is silent with regard to payment of attorney's fees.

### *IV. Post-Judgment Interest*

Williams asserts the circuit court erred in amending its March 20 judgment more than 30 days after the judgment became final because the circuit court's authority to amend the judgment after the 30-day window was limited to matters specifically raised in timely filed after-trial motions pursuant to Rules 75.01 and 81.05.

### Standard of Review

This Court reviews its rules *de novo* because the principles used for the interpretation of rules are the same as those used for statutory interpretation. *McGuire* 447 S.W.3d at 662.

### Analysis

The circuit court entered an amended judgment on March 20, and Mercy filed post-trial motions on two dates – April 7 and April 27. The April 7 filing included a motion to amend the judgment, but it did not mention striking post-judgment interest.

---

payments to be $14,367.82, per month plus annual interest of 1.20% for a total monthly payment of $14,540.23."

The untimely April 27 motion objected to the inclusion of post-judgment interest under section 538.300.[12]

Two procedural rules govern the circuit court's authority to amend a judgment: Rule 75.01 and Rule 81.05. Rule 75.01 allows circuit courts to "retain[] control over judgments during the [30]-day period after entry of judgment and may, after giving the parties an opportunity to be heard and for good cause, vacate, reopen, amend, or modify its judgment within that time." A judgment becomes final after this 30-day window expires if neither party has filed an authorized after-trial motion. Rule 81.05.

In a recent decision, this Court clarified the powers these two rules confer on the circuit court. *State ex rel. Hawley v. Pilot Travel Ctrs., LLC*, 558 S.W.3d 22, 27 (Mo. banc 2018). In *Pilot*, this Court emphasized, "Once the thirty day period in Rule 75.01 expires, a trial court's authority to grant relief is constrained by and limited to the grounds raised in a timely filed, authorized after-trial motion." *Id.* Rule 81.05 "restricts the circuit court's authority to change its judgment, in any way, by limiting the court's scope to those grounds raised in a timely filed after-trial motion." *Id.*

*Pilot* is governing here. Because the April 27 motion was not filed within 30 days of the entry of judgment, the circuit court did not have the authority to amend the judgment to remove post-judgment interest. Its authority to amend the judgment was limited to those grounds raised in the timely filed April 7 motion.

---

[12] Section 538.300 prohibits the inclusion of post-judgment interest in medical malpractice actions. *See Dieser v. St. Anthony's Med. Ctr.*, 498 S.W.3d 419, 428 (Mo. banc 2016).

16

Mercy argues that even though its motion to remove post-judgment interest was not timely filed, the circuit court nonetheless had the authority to remove post-judgment interest under Rule 78.08. Rule 78.08 states, "Plain errors affecting substantial rights may be considered at a hearing on motion for a new trial, in the discretion of the court, though not raised in the motion or defectively raised, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Mercy argues Rule 78.08 should apply to grant the circuit court specific authority to correct the judgment. But Rule 78.08 gives the circuit court the power to consider at a hearing on a motion for a new trial plain error not timely raised as well as *whether a new trial should be granted* as a result of the error.[13] Rule 78.08's plain error review is only for the time period during which the circuit court has authority. Rule 78.08 does not give the circuit court authority, after the court lost it, to amend the judgment after the 30-day period for reasons not preserved in a timely filed after-trial motion.

Alternatively, Mercy contends that had the circuit court not amended the judgment to remove post-judgment interest, it would have argued this Court should review the inclusion of post-judgment interest for plain error pursuant to Rule 84.13(c). But plain error review is rarely granted in civil cases. *Mayes v. St. Luke's Hosp. of Kansas City*, 430 S.W.3d 260, 269 (Mo. banc 2014). This Court has discretion in granting plain error

---

[13] *See Estate of Overbey v. Franklin*, 558 S.W.3d 564 (Mo. App. 2018); *Bean v. Superior Bowen Asphalt Co., LLC*, 340 S.W.3d 275 (Mo. App. 2011); *Nguyen v. Buffington*, 236 S.W.3d 704 (Mo. App. 2007); *McCormack v. Capital Elec. Const. Co., Inc.*, 159 S.W.3d 387 (Mo. App. 2004); *MFA Oil Co. v. Robertson-Williams Transp., Inc.*, 18 S.W.3d 437 (Mo. App. 2000); *Hill v. Hyde*, 14 S.W.3d 294 (Mo. App. 2000).

review and "will review an unpreserved point for plain error only if there are substantial grounds for believing that the trial court committed error that is evident, obvious and clear and where the error resulted in manifest injustice or miscarriage of justice." *Id.* Further, to reverse for plain error in a civil case, the injustice must be "so egregious as to weaken the very foundation of the process and seriously undermine confidence in the outcome of the case." *McGuire*, 375 S.W.3d at 176.

Mercy argues the inclusion of post-judgment interest is a miscarriage of justice because it results in Williams receiving a windfall recovery.[14] But the inclusion of post-judgment interest here does not rise to the level of manifest injustice or miscarriage of justice. In some cases, such as when a constitutional right is violated, a circuit court's failure to follow a statute will warrant plain error review. *See Pfarr*, 375 S.W.2d at 9. But a miscarriage of justice does not necessarily result if a circuit court does not follow the law. Inclusion of post-judgment interest does not weaken the very foundation of the process or undermine confidence in the outcome of this case.

Because Mercy's motion to amend the judgment to strike the post-judgment interest was not filed within 30 days of the judgment, the circuit court did not have authority to amend the judgment to strike post-judgment interest.[15] The judgment is

---

[14] For this assertion, Mercy relies on *Union Elec. Co. v. Pfarr*, 375 S.W.2d 1 (Mo. 1964). In *Pfarr*, a condemnation action, the circuit court included interest on the plaintiff's award, which was prohibited by statute. *Id.* at 9. The Court concluded the inclusion of interest was plain error because it "so clearly violate[d] the constitutional right of defendants to be paid the full amount of the compensation awarded." *Id.* The instant case is distinguishable from *Pfarr* because the inclusion of post-judgment interest does not violate Mercy's constitutional rights.

[15] As this case is being reversed and remanded on other grounds, this Court need not address Williams' argument that the circuit court erred in not awarding post-judgment interest because denying post-judgment interest violates her "fundamental property rights to equal protection

18

reversed to the extent it sustained the April 27 motion to amend, and the case is remanded for re-insertion of post-judgment interest.

## V. Alleged Errors in Instruction 6

Mercy makes three arguments regarding the submission of Instruction 6 to the jury.[16] First, Mercy argues Instruction 6 constituted a roving commission because it did not include the specific dates Dr. Pilapil treated Williams. Next, Mercy argues subpart B of Instruction 6 was "vague and confusing" because it did not define the phrases "medical chart" and "failed to adequately consider" for the jury. Finally, Mercy argues subparts A and B of Instruction 6 were not supported by substantial evidence.

## Standard of Review

The question whether a jury was properly instructed is subject to *de novo* review. *Spence v. BNSF Ry. Co.*, 547 S.W.3d 769, 777 (Mo. banc 2018). "An instructional error is only grounds for reversal when the instruction misdirected, misled, or confused the jury and resulted in prejudice." *Id.* This Court will reverse only if the error resulted in prejudice that materially affected the merits of the case. *Hervey v. Mo. Dep't of Corr.*, 379 S.W.3d 156, 159 (Mo. banc 2012). Review is conducted in the light most favorable to the instruction's submission. *Klotz*, 311 S.W.3d at 766. If any theory supports the instruction's submission, its submission is proper. *Id.*

---

under the law as guaranteed by article I, section 2 of the Missouri Constitution" by "amount[ing] to an unlawful taking of the full value of [Williams'] verdict due to the time value of money."
[16] All three of these involve claims that the circuit court erred in overruling Mercy's motion for new trial or mistrial.

## Analysis

### A. Failure to Specify Dates in Instruction 6

Mercy argues the circuit court erred in submitting Instruction 6 to the jury because the instruction did not include the specific dates Dr. Pilapil treated Williams, resulting in a roving commission. According to Mercy, the "instruction permitted the jury to find Dr. Pilapil negligent for any interaction or visit she had with [Williams], including visits after May 2013, despite the fact that [Williams'] damages testimony was based on her causation expert's opinion that [Williams] suffered her damages before May 2013."

"A roving commission occurs when an instruction . . . submits an abstract legal question that allows the jury to roam freely through the evidence and choose any fact which suit[s] its fancy or its perception of logic to impose liability." *Klotz*, 311 S.W.3d at 766. When determining whether a roving commission occurred, a jury instruction should be considered in the context of the trial as a whole. *Id.*; *Stone v. Duffy Distribs., Inc.*, 785 S.W.2d 671, 678 (Mo. App. 1990).

Instruction 6 stated:

Your verdict must be for plaintiff Emilee Williams if you believe:

First, Dr. Pilapil either:

> a. Failed to take an adequate history in regards to Emilee Williams' tremor, or

> b. Failed to adequately consider Emilee Williams' medical chart as part of her comprehensive review, or

> c. Provided Emilee Williams incorrect medical advice in regards to her tremors, or

20

d. Failed to timely refer Emilee Williams for a neurological consultation, and

Second, Dr. Pilapil in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to Emilee Williams.

The term "negligent" or "negligence" as used in this instruction means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of Dr. Pilapil's profession.

Williams visited Dr. Pilapil four times – in December 2012, January 2013, May 2013, and June 2013. The evidence and Williams' counsel's closing argument specified to the jury the timeline of Williams' treatment. Williams' damages evidence was not solely based on Dr. Pilapil's negligence in December 2012 and January 2013. The jury heard testimony from Williams' standard of care experts, Dr. Lisa Shah and Dr. Donald Frey, that Dr. Pilapil violated the standard of care during the December 2012, January 2013, and May 2013 visits because she failed to take a proper medical history, provided incorrect medical advice, did not consider Williams' medical records, and failed to refer Williams to a neurologist or follow up with a second neurological exam. Dr. Stanley Fischer, Williams' life care expert, testified that had Williams been properly diagnosed and treated for Wilson's disease in "late 2012, earlier in 2013, even getting up to as far as maybe May of 2013" she would have been "normal or essentially normal."

When determining whether a roving commission occurred, a jury instruction should be considered in the context of the trial as a whole. *Klotz*, 311 S.W.3d at 767; *Stone*, 785 S.W.2d at 678. When considered in the context of the trial as a whole, the

21

jury instruction was clear. The jury was not misdirected or confused, and no prejudice resulted. Inclusion of the treatment dates would not have affected the merits of this case, as the evidence and closing argument indicated the jury should consider the alleged negligent conduct of Dr. Pilapil from December 2012 through May 2013. In closing argument, Williams' counsel specifically told the jury to consider Dr. Pilapil's conduct up until the end of May 2013 and explained that had Dr. Pilapil not been negligent prior to the end of May, Williams would not have suffered injury. Closing argument is expected to provide the necessary evidentiary details as well as how those details fit into the legal framework the court gives the jury. *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 396 (Mo. App. 2014). Instruction 6 did not constitute a roving commission, and the circuit court did not err in submitting it to the jury.

*B. Defining Terms in Instruction 6, Subpart B*

Mercy similarly argues the circuit court erred in submitting subpart B of Instruction 6 to the jury because it was vague and confusing and resulted in a roving commission. Specifically, Mercy asserts the phrases "medical chart" and "failed to adequately consider" should have been defined for the jury.

Subpart B of Instruction 6 stated the verdict must be for Williams if the jury believed Dr. Pilapil "[f]ailed to adequately consider Emilee Williams' medical chart as part of her comprehensive review." Mercy argues the instruction should have clearly defined "failed to adequately consider" and should have indicated what documents or records constituted Williams' "medical chart." Mercy did not raise this instructional challenge during the instructions conference or in its motion for new trial, so it has not

22

been preserved for appellate review. *See* Rules 70.03 and 78.07(a); *Wieland v. Owner-Operator Servs., Inc.*, 540 S.W.3d 845, 850 (Mo. banc 2018). "Timely objections [to an instruction] are required as a condition precedent to appellate review in order to afford the trial court an opportunity to correct any mistakes immediately and inexpensively without risking the delay and expense of an appeal and a retrial." *Ross-Paige v. St. Louis Metropolitan Police Dep't*, 492 S.W.3d 164, 170 (Mo. banc 2016).

During trial, Mercy did not make any objections referencing the phrases "failed to adequately consider" or "medical chart," and Mercy never stated that these terms needed to be defined for the jury. Mercy's only objection mentioning a roving commission referred to the lack of time specificity in Instruction 6. Had Mercy believed the phrases were unclear, Mercy should have objected at trial and offered an instruction defining those phrases. *Seidel v. Gordon A. Gundaker Real Estate Co.*, 904 S.W.2d 357, 364 (Mo. App. 1995). Failure to make this objection resulted in the argument not being properly preserved for appellate review.

*C. Substantial Evidence to Support the Subparts of Instruction 6*

Mercy also contends the circuit court erred in submitting Instruction 6 because there was not substantial evidence from which the jury could find that the factors stated in subparts A and B independently caused Williams' injuries. Mercy asserts that because Instruction 6 was disjunctive, "each subpart had to have been independently sufficient, which means that the conduct in each must have independently caused [Williams'] injuries." According to Mercy, Williams did not prove Dr. Pilapil's alleged failure "to

23

take an adequate history" or "to adequately consider [Williams'] medical chart" caused Williams' injuries independent of Dr. Pilapil's failure to make a timely referral.

Any issue within a jury instruction must be supported by substantial evidence from which the jury could reasonably find such issue. *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo. banc 2010). Substantial evidence is evidence, which if true, is probative of the issues and could lead to a jury's decision. *Id.* "If the instruction is not supported by substantial evidence, there is instructional error, which warrants reversal 'only if the error resulted in prejudice that materially affects the merits of the action.'" *Id.* For a disjunctive verdict directing instruction, as is Instruction 6, to be deemed appropriate, there must be substantial evidence to support each alternative. *Ross-Paige*, 492 S.W.3d at 172.

Mercy specifically argues subparts A and B of Instruction 6 are not supported by substantial evidence. These subparts instructed the jury its verdict must be for Williams if it believed Dr. Pilapil either (a) "[f]ailed to take an adequate history in regards to [Williams'] tremor" or (b) "[f]ailed to adequately consider [Williams'] medical chart as part of her comprehensive review." Mercy asserts Williams' primary liability theory was encompassed in subpart D of the instruction, which stated that the jury's verdict must be for Williams if it believed Dr. Pilapil "[f]ailed to timely refer [Williams] for a neurological consultation." Mercy argues the failure to take an adequate history or failure to adequately consider the medical chart are reasons why Williams claimed Dr. Pilapil failed to make a timely referral but, according to Williams' theory of liability, neither of these factors independently caused Williams' injuries.

24

Because subparts of a jury instruction might causally contribute to the same damages does not necessarily mean each subpart is not supported by substantial evidence. Subparts of jury instructions are often causally related. For instance, in *Lindquist,* the circuit court instructed the jury to assess a percentage of fault to the defendant if it believed the defendant either: "[f]ailed to take an adequate history, or [f]ailed to perform an adequate physical examination, or [f]ailed to order MRI of his thoracic spine." *Lindquist v. Scott Radiological Grp., Inc.*, 168 S.W.3d 635, 652 (Mo. App. 2005). The plaintiff's theory of liability was the defendant's delayed diagnosis of spinal cancer, and there was evidence the failure to take an adequate history or failure to perform an adequate physical examination caused the failure to order the MRI. *Id.* at 641.

Here, it is possible Dr. Pilapil's failure to take an adequate history of Williams' tremor and failure to adequately consider Williams' medical chart resulted in Dr. Pilapil failing to make a timely referral, but that does not mean these subparts of the instruction were not each supported by substantial evidence. Additionally, the jury heard evidence that Dr. Pilapil could have diagnosed Williams' Wilson's disease through avenues other than a timely referral to a neurologist, such as through a blood test or by ordering an MRI. Williams' theory of liability did not rest solely on Dr. Pilapil's failure to timely refer her to a neurologist.

Further, Dr. Frey testified that Dr. Pilapil failed to take a thorough history during each of the first three visits, which prevented her from knowing the severity of the tremor and whether its status had changed over time. He stated that Williams' tremor was a "red flag" that should have been considered in light of her past medical issues, such as her

25

heart condition, leg swelling, and liver problems. He noted that Dr. Pilapil's recorded medical history of Williams did not mention the location or type of the tremor. There was also testimony from Dr. Frey and Mercy's experts, Dr. Steven Frucht and Dr. Michael LeFevre, that a unilateral tremor is unusual in a young adult and indicates a problem more severe than anxiety. Subparts A and B of Instruction 6 were supported by substantial evidence. The jury could have found that Dr. Pilapil both failed to take an adequate history of Williams' tremor and failed to adequately consider Williams' medical chart because both of these acts were supported by expert testimony. The circuit court did not err in submitting Instruction 6 to the jury because the subparts were supported by substantial evidence.

### VI. Testimonies of Dr. Belz and Dr. Fischer

Mercy argues the circuit court erred in admitting portions of the testimonies of Williams' life care experts, Dr. Fischer and Dr. Norbert Belz, because their statements materially differed from their deposition testimonies and "surprised" Mercy. Mercy emphasizes that during trial, Dr. Belz discussed the meaning of the term "subacute necrosis," his opinion of the 2017 MRI, and his opinion of when the damage to Williams' brain allegedly occurred, yet during his deposition he stated he was retained to prepare a life care plan and did not mention these concepts.

Mercy argues Dr. Fischer's testimony concerning whether Trientine caused Williams' neurological damage, the timing of Williams' treatment, and the significance of bilateral and unilateral tremors materially differed from his prior deposition testimony.

26

**Standard of Review**

The circuit court is granted considerable discretion in deciding whether to admit or exclude evidence. *Shallow v. Follwell*, 554 S.W.3d 878, 881 (Mo. banc 2018). "A trial court's decision regarding admissibility of evidence is reviewed only for an abuse of discretion, such as when the ruling is clearly against the logic of the circumstances and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Howard v. City of Kansas City*, 332 S.W.3d 772, 785-86 (Mo. banc 2011). When an expert provides different testimony from that disclosed in discovery, a circuit court has broad discretion as to its course of action. *Beverly v. Hudak*, 545 S.W.3d 864, 870 (Mo. App. 2018). This Court will not reverse unless the error "materially affected the merits of the action." *Shallow*, 554 S.W.3d at 881.

**Analysis**

This Court's rules permit a party to depose an expert to discover the facts and opinions to which the expert is expected to testify. Rule 56.01(b)(4). "[W]hen an expert witness has been deposed and he later changes his opinion before trial or bases that opinion on new or different facts from those disclosed in the deposition, it is the duty of the party intending to use the expert witness to disclose that new information to his adversary." *Shallow*, 554 S.W.3d at 881. "This principle is not intended as a mechanism for contesting every variance between discovery and trial testimony [because] [i]mpeachment of the witness will accomplish that goal." *Id.* "Rather, its purpose is to relieve a party who is genuinely surprised at trial." *Id.* Surprise occurs "when an expert

27

witness suddenly has an opinion where he had none before, renders a substantially different opinion than the opinion disclosed in discovery, uses new facts to support an opinion, or newly bases that opinion on data or information not disclosed during the discovery deposition." *Id.* (quoting *Sherar*, 98 S.W.3d at 634). But surprise cannot be "manufactured." *Beverly*, 545 S.W.3d at 870. "A party cannot claim surprise based on 'new opinions' as to matters about which the expert witness has not been asked during discovery." *Id.*

### *A. Testimony of Dr. Belz*

Mercy argues that, at trial, Dr. Belz offered "new opinions where he had none before and offered entirely new bases for his opinions." Specifically, Mercy asserts Dr. Belz should not have been permitted to testify about the meaning of the term "subacute necrosis," his opinion of the 2017 MRI, or his opinion of when the damage to Williams' brain allegedly occurred because he did not mention any of these topics during his deposition.

At trial, Dr. Belz opined that the term "subacute necrosis" noted on the 2013 MRI report indicates cell death that occurs between one and three months. He testified this means that if the first MRI had been taken in December 2012 or January 2013, it would not have looked the same as the MRI taken in August 2013. Dr. Belz also stated that he believed the 2017 MRI looked the same as the 2013 MRI, an opinion mirroring that of Mercy's expert, Dr. Frucht.

Dr. Belz's testimony regarding the concept of subacute necrosis, the 2017 MRI, and causation did not constitute surprise. Dr. Belz's trial testimony was within his area

28

of expertise, as he was retained to perform an independent medical exam of Williams and to create her life care plan, which required consideration of Williams' injuries, the causes of the injuries, and her current and future care needs. He brought to the deposition Williams' entire medical file – including the 2013 MRI report, which referenced subacute necrosis. During the deposition, Mercy questioned Dr. Belz regarding the bases for his conclusions regarding Williams' future needs detailed in the life care plan, and Dr. Belz explained the information was from a number of sources, including Williams' medical records. Mercy had the opportunity to question Dr. Belz regarding the 2013 MRI, including the concept of subacute necrosis and causation, but it did not.

During the time period between Dr. Belz's deposition and trial, Dr. Belz ordered the 2017 MRI of Williams. Mercy received a copy of the MRI report, and Williams' counsel indicated to Mercy that Dr. Belz's opinion had not changed. It is unclear how Mercy could have been genuinely surprised by Dr. Belz's testimony, as a party cannot claim surprise based on "new opinions" the expert witness was not asked about during discovery. *Id.* at 870. Mercy was aware Dr. Belz had relied on the 2013 MRI in formulating his life care plan for Williams. Further, prior to trial, Williams' counsel informed Mercy of Dr. Belz's opinion regarding the new MRI.

Allowing Dr. Belz to testify regarding the 2017 MRI, the concept of subacute necrosis, and causation was not so arbitrary and unreasonable as to indicate a lack of careful consideration by the circuit court and did not affect the merits of this case. There was no abuse of discretion in admitting those portions of the testimony of Dr. Belz.

29

*B. Testimony of Dr. Fischer*

Mercy points to three alleged errors in Dr. Fischer's testimony. It argues Dr. Fischer's trial testimony about whether Trientine caused Williams' neurological damage, the timing of Williams' treatment, and the significance of bilateral and unilateral tremors materially differed from his prior deposition testimony.

*1. Testimony Regarding Trientine*

Mercy initially claims the circuit court abused its discretion in admitting Dr. Fischer's trial testimony about whether Trientine caused Williams' neurological deterioration. Williams had been prescribed Trientine by doctors at the Wilson's Disease Center for Excellence in August 2013.

Dr. Fischer testified at his deposition that the administration of Trientine had caused neurological damage to Williams. At trial, Dr. Fischer noted that he had thought Trientine caused Williams' deteoriation, but he began to question his belief after the second depositions of doctors at the Wilson's Disease Center and after his review of the 2017 MRI. He recognized the other doctors' depositions had cast doubt on his opinion that Trientine caused Williams' neurological damage. During cross-examination, Mercy's counsel impeached Dr. Fischer for doubting his own opinion, but Dr. Fischer did not deny Williams' condition had worsened within months after she first took Trientine. To the extent there was any variance in Dr. Fischer's testimony regarding the Trientine, the impeachment of Dr. Fischer was an adequate remedial measure. The remedy for variances in deposition and trial testimony is cross-examination. *Beverly*, 545 S.W.3d at 871. The decision to allow Dr. Fischer to cast doubt on his previously stated opinion

30

regarding whether Trientine caused Williams' neurological deterioration after he viewed the 2017 MRI was not an abuse of discretion in that it was not so arbitrary and unreasonable as to indicate a lack of careful consideration by the circuit court and did not materially affect the merits of this case.

*2. Testimony Regarding Timing*

Mercy next argues Dr. Fischer "revised his opinions about when [Williams] needed to have been treated and offered new bases for his opinions that [Williams'] outcome would have been better if she had been treated earlier." Specifically, Mercy argues the change in Dr. Fischer's trial testimony "substantially enlarge[ed] the time when Dr. Pilapil's alleged negligence might have mattered to [Williams'] conduct." Mercy's argument is without merit.

Dr. Fischer was consistent in his opinion that, had Williams been treated earlier, she would have been normal. During the deposition, Dr. Fischer testified that had Dr. Pilapil made a diagnosis in December 2012 or January 2013, Williams would have been "totally normal." He testified that had the diagnosis occurred in May 2013, "the outcome . . . would have been significantly better than it is and was" and Williams would be "almost normal." He then stated that had she been diagnosed on June 28, 2013, "she would not have gotten as bad" and "her ultimate outcome would have been better." According to Dr. Fischer, each day that passed without a diagnosis between March and August 2013 worsened Williams' ultimate condition.

At trial, Dr. Fischer's testimony was similar. He testified, "It is my opinion that had the condition been diagnosed in late 2012, earlier in 2013, even getting up to as far as

31

maybe May of 2013, [Williams] would be normal or essentially normal." He further testified that the first record that mentioned symptoms of dystonia was made on June 28, 2013, and that the damage referenced was reversible. Dr. Fischer's trial testimony was not different than his deposition testimony. His opinion as to when Williams' brain damage was reversible was consistent.

Mercy also points out the term "necrosis," which Dr. Fischer mentioned once at trial, was not mentioned in his deposition. The term "necrosis" appeared on the 2013 MRI, which Dr. Fischer had in his file at the time of his deposition. During the deposition, Dr. Fischer stated he reviewed the 2013 MRI images and report. At the deposition, Mercy questioned Dr. Fischer about the findings on the MRI report. Mercy had the opportunity to question him about the meaning of the term "necrosis" on the report, but it did not.

Again, Mercy had the opportunity to cross-examine Dr. Fischer and to impeach him regarding any potential variance in his testimony, which was an adequate remedial measure. *Beverly*, 545 S.W.3d at 871. The decision to admit Dr. Fischer's testimony regarding the timing of the diagnosis was not an abuse of discretion as it was not so arbitrary and unreasonable as to indicate a lack of careful consideration by the circuit court and did not materially affect the merits of this case.

### 3. Testimony Regarding Unilateral Versus Bilateral Tremors

In its third claim of error regarding Dr. Fischer's testimony, Mercy argues the circuit court abused its discretion in admitting his trial testimony regarding unilateral and bilateral tremors because he did not discuss the distinction between these two tremors

during his deposition, and because, during his deposition, Dr. Fischer stated that he would not offer standard-of-care testimony.

The circuit court allowed Williams' counsel to question Dr. Fischer about the distinction between unilateral and bilateral tremors in response to Dr. Frucht's earlier testimony that a beta-agonist can cause a unilateral tremor. Dr. Fischer's testimony, in rebuttal, explained potential causes of tremors. He did not testify about Dr. Pilapil's alleged negligence or her alleged violation of the standard of care, and he did not offer a substantially new opinion. Mercy could not have been genuinely surprised by Dr. Fischer's testimony. *Shallow*, 554 S.W.3d at 881. Whether to admit rebuttal evidence is largely within the trial court's discretion, and that discretion is given substantial deference on appeal. *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 768 (Mo. banc 2011). Further, a party who has introduced evidence concerning a certain fact may not argue on appeal that the opponent was allowed to introduce related rebuttal or explanatory evidence. *Pub. Sch. Ret. Sys. of Mo. v. Taveau*, 481 S.W.3d 10, 25 (Mo. App. 2015); *St. Louis Cty v. River Bend Estates Homeowners' Ass'n*, 408 S.W.3d 116, 125 (Mo. banc 2013).

The decision to admit Dr. Fischer's testimony distinguishing between unilateral and bilateral tremors was not so arbitrary and unreasonable as to indicate a lack of careful consideration by the circuit court and did not affect the merits of this case. The circuit court did not abuse its discretion in admitting the testimony of Dr. Fischer.

## Conclusion

The application of section 538.220.2 is unconstitutional as applied to Williams because payment of future medical damages at a different interest rate than the interest rate used to compute the present value of the jury's award deprives Williams of the full value of the award and violates her due process rights. Further, because Mercy's motion to amend the judgment to strike post-judgment interest was not filed within 30 days of the entry of judgment, the circuit court did not have authority to amend the judgment to remove post-judgment interest. The circuit court's judgment is reversed to the extent it deprived Williams of the full value of the jury's award, violating her due process rights, and to the extent it sustained the untimely April 27 motion to amend striking post-judgment interest. The case is remanded for entry of a new judgment in accordance with this opinion. In all other aspects, the judgment is affirmed.

 

 

_____
Mary R. Russell, Judge

 

All concur.

34