

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| KATHERINE HARNED, | ) | |
| | ) | |
| Respondent, | ) | WD84990 |
| | ) | |
| v. | ) | OPINION FILED: August 23, 2022 |
| | ) | |
| DANIEL V. SPURLOCK, D.O., ET | ) | |
| AL., | ) | |
| | ) | |
| Appellants. | ) | |

**Appeal from the Circuit Court of Clay County, Missouri**
The Honorable Alisha O'Hara, Judge

Before Division Three: Cynthia L. Martin, Presiding Judge, Lisa White Hardwick, Judge,
W. Douglas Thomson, Judge

Daniel Spurlock, D.O., ("Dr. Spurlock") and Meritas Health Corporation
("Meritas"), collectively ("Defendants"), appeal from the trial court's entry of judgment
pursuant to a jury verdict in favor of Katherine Harned ("Harned") on her claims for
medical malpractice. Defendants argue that the trial court erred in denying their motion
for new trial on the basis of juror misconduct; in submitting a verdict director that was
vague, unsupported by the evidence, and gave a roving commission; in limiting cross-

examination of an expert witness; and in denying their motion for remittitur.  Finding no error, we affirm.

### Factual and Procedural History[1]

Harned has diagnoses of bipolar disorder, borderline personality disorder, and generalized anxiety disorder.  She also has a history of psychosis, and in May, 2016, Harned began experiencing psychotic symptoms.  In May and June, 2016, Harned was seen twice at Truman Medical Center, and once at Liberty Hospital, after expressing suicidal ideations.  From Liberty Hospital, she was discharged to St. Francis Hospital for inpatient psychiatric treatment for fourteen days.

On July 23, 2016, Harned was again seen at Liberty Hospital after she attempted to commit suicide by overdosing on a prescribed anti-depressant and a pain medication.  Harned was admitted to Liberty Hospital.  Dr. Elizabeth Gerstner ("Dr. Gerstner"), the attending physician at Liberty Hospital, placed Harned on a low dose of Ativan.

On July 25, 2016, Dr. Spurlock was working as a consulting psychiatrist at Liberty Hospital when he evaluated Harned.  Dr. Spurlock testified that it was his job to evaluate Harned's safety, and to determine whether she should be discharged to inpatient psychiatric treatment, or whether she could be discharged with alternative plans.  Spurlock had access to, and testified that she had reviewed, Harned's past medical records, which reflected that Harned did not have a primary treating psychiatrist.  Dr. Spurlock knew that Harned had

---

[1]"On appeal in a jury-tried case, we review the evidence and reasonable inferences therefrom in a light most favorable to the jury's verdict, disregarding evidence to the contrary." *Shuttlewagon, Inc. v. Higgins*, 628 S.W.3d 185, 189 n.1 (Mo. App. W.D. 2021) (quoting *Brummett v. Burberry Ltd.*, 597 S.W.3d 295, 299 n.1 (Mo. App. W.D. 2019)).

already scheduled an initial intake appointment for August 2, 2016 with a social worker at Tri-County Mental Health. Dr. Spurlock "felt that [Harned] was doing well [when he saw her, and] that there was no reason she couldn't keep that" appointment. Dr. Spurlock recognized that the August 2, 2016 appointment was eight days away, and that the appointment would be with a social worker and not a psychiatrist. Dr. Spurlock noted, however, that Harned's mother promised to monitor Harned and to control her medications until she could be seen by a psychiatrist.

Dr. Spurlock determined that Harned should be discharged to her mother's care, without inpatient psychiatric treatment. Dr. Spurlock also determined that Harned's low dose of Ativan should be continued upon her discharge, with no additional medications being prescribed. Ativan has "some anxiety-relieving benefits," which is the primary reason it is used, but Dr. Spurlock stated that it "also has some mood-stabilizing properties and helps with agitation." Dr. Spurlock acknowledged that there are stronger mood-stabilizing drugs available. However, Dr. Spurlock testified:

> I felt it was valid to go ahead and have her on [Ativan], which would provide some of the calming effect and stabilizing properties and not put her on another medication that -- I mean, mood stabilizers can have significant side effects. Depakote, lithium, those medications, you have to get blood work done [] sporadically. You have [to] test levels, generally in a week is recommended, and so there can be a lot of problems with those, and she was not going to be in with anybody's -- with me specifically at that time, and I felt it would be worthwhile to hold off.

Harned was discharged from Liberty Hospital on July 25, 2016, the same day she was evaluated by Dr. Spurlock.

3

On August 8, 2016, Harned again attempted suicide, this time by dousing herself in hairspray and setting herself on fire. Harned suffered third-degree burns on forty-two percent of her body including to her face, neck, torso, arms, and legs. Dr. Dhaval Bhavsar ("Dr. Bhavsar"), Harned's treating physician, testified that treating Harned's burns "was a matter of life and death." Harned underwent four skin graft surgeries and nearly two dozen laser surgeries.

Harned filed a lawsuit alleging medical malpractice against Dr. Spurlock, Dr. Gerstner, New Liberty Hospital Corporation, and Meritas in the Circuit Court of Clay County, Missouri, arguing that each breached the standard of care when treating Harned during her July 2016 hospitalization. A jury trial began on July 6, 2021. Harned dismissed her claims against Dr. Gerstner and New Liberty Hospital Corporation during trial.

Harned presented testimony from several witnesses, including Dr. Bhavsar, and Dr. Geetha Jayaram ("Dr. Jayaram"), an expert witness specializing in psychiatry. Dr. Bhavsar testified about the nature, extent, and treatment of Harned's burn injuries. Dr. Jayaram testified that there are various levels of psychiatric care, including inpatient care, where a patient stays and is treated in a hospital setting; outpatient care, which can be "intensive," meaning the patient "comes three times a week to see a therapist," or receives outpatient services less frequently; and day hospital care, where a patient receives care in the hospital during the day only. Dr. Jayaram opined that when Harned was discharged from Liberty Hospital on July 25, 2016, she should have been sent to inpatient care because that was the safest level of care for her at that time. Dr. Jayaram also explained that the standard of care requires a doctor to figure out what medications work or don't work, and why, customized

4

to each patient, by looking at "safety, tolerability, efficacy of the drug improvement clinical scientific trials, price, [and] simplicity of dosing and administration." Dr. Jayaram opined that "if the patient has a primary disorder such as bipolar illness, she needs to be on a mood stabilizer. She needs to be on an antipsychotic if she's had psychotic symptoms." Dr. Jayaram pointed out that despite Harned's diagnoses and symptoms, Dr. Spurlock did not prescribe either a mood stabilizer or an antipsychotic medication.

The jury returned its verdict in favor of Harned and against Defendants, assessing 100 percent of the fault for Harned's personal injuries to the Defendants. The jury found the total compensatory damages for Harned's personal injuries to be $246,288.68 for past economic damages, $260,000 for past noneconomic damages, and $300,000 for future noneconomic damages, for total damages in the amount of $806,288.68.

On July 28, 2021, Defendants filed a motion for remittitur pursuant to section 538.210.2(1)[2] ("Motion for Remittitur"), which argued that Harned's injuries did not qualify as a catastrophic personal injury under section 538.205(1) because "there was no evidence at trial that [she] suffered *irreversible* failure of one or more major organ systems." (Emphasis in original). Defendants argued that she was therefore not eligible for the higher noneconomic damages cap set forth in section 538.210.2(2). Defendants asserted that the lower noneconomic damages cap set forth in section 538.210.2(1) applied, and that the trial court should reduce Harned's noneconomic damages by $117,426. On

---

[2]All references to section 538.205 and section 538.210 are to the versions as amended in 2020. *Ordinola v. Univ. Physician Assocs.,* 625 S.W.3d 445, 453-454 (Mo. banc 2021) (holding that statutes setting forth noneconomic damage caps are procedural, and apply retrospectively, so that the version of the statutes in effect at the time of trial, and not at the time of injury, apply).

August 17, 2021, the trial court issued a judgment consistent with the jury's verdict in the amount of $806,288.68 ("Judgment"), effectively denying the Motion for Remittitur.

On August 31, 2021, Defendants filed a motion for new trial ("Motion for New Trial"), alleging that prejudicial juror misconduct occurred during trial when a juror obtained extraneous evidence and shared it with other jurors; that the trial court erred by submitting Instruction No. 8, the verdict director, because it was unsupported by substantial evidence and was overly broad; and that the trial court erred when it prohibited Defendants from cross-examining Dr. Jayaram about "whether other healthcare providers provided similar care" to that of Dr. Spurlock when treating Harned in order to challenge Dr. Jayaram's opinion about the standard of care.

Defendants attached affidavits from three jurors to the Motion for New Trial. The affidavits alleged that during deliberations, each juror heard another juror ("Challenged Juror"), "make statements that she had conducted her own medical research on the [i]nternet regarding the drug Ativan." The three jurors alleged that the Challenged Juror told "the jury during deliberations that Ativan can cause hallucinations," that they did not believe that information was ever introduced at trial, and that the information was "interjected into [their] deliberations," leading them to "believe that other jurors improperly acted on this information in finding for [Harned]."

On November 12, 2021, the trial court issued a docket entry denying the Motion for New Trial, and finding "that no prejudicial misconduct occurred."

Defendants appeal.

6

**Analysis**

Defendants raise four points on appeal. Point One argues that the trial court erred when it failed to recognize that the Challenged Juror's juror misconduct created a presumption that Defendants were prejudiced and shifted the burden to Harned to establish an absence of prejudice, which she failed to do. Point Two asserts that the trial court erred when it submitted Instruction No. 8, the verdict director, because the instruction was vague, unsupported by the evidence, and gave the jury a roving commission. Point Three contends that the trial court erred when it prohibited Defendants from asking Dr. Jayaram during cross-examination whether other healthcare providers met the standard of care in their treatment of Harned, preventing Defendants from testing the accuracy and credibility of Dr. Jayaram's standard of care opinions. Point Four argues that the trial court erred in overruling Defendant's Motion for Remittitur because it applied the incorrect statutory cap for noneconomic damages. We address the points in order.

***Point One: The trial court did not err in denying Defendants' Motion for New Trial on the basis of juror misconduct because the trial court did not find that juror misconduct occurred, and even if the trial court had found that misconduct occurred, Harned sufficiently rebutted the presumption of prejudice.***

In their first point on appeal, Defendants argue that it was error to deny their Motion for New Trial because the trial court failed to recognize that the Challenged Juror's misconduct created a presumption that Defendants were prejudiced and shifted the burden to Harned to establish an absence of prejudice, which she failed to do.

7

We will not disturb the court's ruling on a motion for new trial based upon juror misconduct unless the trial court has abused its discretion.[3] *Ross v Jeschke Ag Serv., LLC*, 552 S.W.3d 719, 724 (Mo. App. W.D. 2018) (citing *Smotherman v. Cass Reg'l Med. Ctr.*, 499 S.W.3d 709, 712 (Mo. banc 2016)). An abuse of discretion occurs when the trial court's ruling "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* (quoting *Smotherman*, 499 S.W.3d at 712). Defendants, as the parties alleging juror misconduct, bear "the burden to show both misconduct and prejudice resulting from that misconduct." *Marcks v. Wilson*, 615 S.W.3d 413, 417 (Mo. App. E.D. 2020) (citing *Williams v. Daus*, 114 S.W.3d 351, 366 (Mo. App. S.D. 2003)).

"Missouri follows the Mansfield Rule, which provides that a juror's testimony about juror misconduct is generally not admissible to impeach the jury's verdict." *Smotherman*, 499 S.W.3d at 712 (citing *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 87 (Mo. banc 2010)). "Nonetheless, juror testimony is admissible to establish that a juror committed misconduct by improperly gathering evidence outside of trial." *Id.* (citing *Travis v. Stone*, 66 S.W.3d 1, 4 (Mo. banc 2002)). In cases of a juror's acquisition of

---

[3]In their brief, Defendants argue that we should review this claim of error *de novo* because the trial court did not hold an evidentiary hearing to take testimony on the juror misconduct claim, and thus had no opportunity to assess credibility or weigh testimony. We disagree. Defendants provide no authority for the proposition that the lack of a hearing following a claim of juror misconduct requires us to apply a *de novo* standard of review. The trial court was "not required to hear testimony from jurors to rule on a motion for new trial that is brought on allegations of juror misconduct." *State v. West*, 425 S.W.3d 151, 155 (Mo. App. W.D. 2014) (citation omitted). "As the fact-finder, it is in the trial court's province to determine the credibility of witnesses[.] . . . '[T]he trial court is presumably acquainted with [the jurors], and, if they are influenced by bias or prejudice, knows that fact. The jurymen are under his eye during the progress of the trial, and their demeanor is observed by him; hence he is in a much better position to arrive at a correct conclusion in regard to their alleged misconduct than we are[.]'" *Smotherman v. Cass Reg'l Med. Ctr.*, 499 S.W.3d 709, 715 (Mo. banc 2016) (quoting *Hoffman v. Dunham*, 202 S.W. 429, 431 (Mo. App. 1918)).

8

extraneous evidence, once it has been found that a juror has committed misconduct by obtaining extraneous evidence against the court's instructions, "such misconduct raises a presumption of prejudice, and the burden shifts to the opposing party to rebut the presumption" by showing that no prejudice resulted from the alleged juror misconduct. *Id.* (citing *Travis*, 66 S.W.3d at 4). However, "[t]o be prejudicial, the extraneous evidence obtained from the juror misconduct must be material to the consequential facts of the case." *Id.* (citing *State v. Stephens*, 88 S.W.3d 876, 883-84 (Mo. App. W.D. 2002)). "Allegations of juror misconduct are not self-proving and must be established by independent evidence." *Meadowfresh Sols. USA, LLC v. Maple Grove Farms, LLC*, 586 S.W.3d 329, 350 (Mo. App. S.D. 2019) (citing *State v. Smith*, 944 S.W.2d 901, 921 (Mo. banc 1997)).

Defendants' allegations of juror misconduct were supported by similarly worded affidavits signed by three jurors, with each attesting that the Challenged Juror made "statements that she had conducted her own medical research on the [i]nternet regarding the drug Ativan" and had told other jurors during deliberations that the drug could cause hallucinations. In response, Harned presented affidavits from the Challenged Juror, two jurors who sat next to the Challenged Juror during deliberations, and the foreperson ("counter affidavits"). The counter affidavits stated that the Challenged Juror did not report conducting internet research on Ativan or its side effects during the trial or deliberations. The Challenged Juror's affidavit specifically attested that she did not conduct or discuss any "internet research" during the trial and deliberations, and that she did "not recall providing any information . . . about Ativan or its side effects--only stating that [she] had taken some of the medications [Harned] has been prescribed and was familiar with them,

9

based on [her] prior life experience, and did not feel based on the evidence presented . . . that Defendants had adjusted [Harned's] medications safely and thus had not adequately planned for [Harned's] safety after discharge." The Challenged Juror's affidavit also pointed out that during jury selection, she reported that she previously "had experienced mental health issues like [Harned] . . . and had taken many medications just like [Harned], which included Wellbutrin and Ativan."

The trial court denied Defendants' Motion for New Trial based upon juror misconduct, finding that "no prejudicial misconduct occurred." Defendants argue that the trial court's conclusion failed to recognize the presumption of prejudice that arose from the Challenged Juror's misconduct, and that Harned thus had the burden to disprove prejudice. This argument, however, incorrectly presumes that juror misconduct was established. The trial court did not find that juror misconduct occurred, and could have concluded that the affidavits attached to the Motion for New Trial were not credible.

First, Defendants' affidavits were challenged by Harned's counter affidavits, which included the Challenged Juror's affidavit denying that she had conducted any independent research during trial, acknowledging that she mentioned her personal experience with "some of the medications [Harned] had been prescribed" to other jurors, but pointing out that she had reported her mental health issues and personal experience with medications like Ativan during *voir dire*.

In addition, the factual allegations in the Defendants' affidavits were identically worded. The three jurors who alleged misconduct were the same three jurors who did not sign the verdict form. The affidavits included nonspecific allegations about when and how

10

the Challenged Juror's purported misconduct came to light. One juror vaguely indicated that she contacted defense counsel "after the trial." The other two jurors stated that they were then directly contacted by defense counsel. The affidavits were sworn six weeks after the jury returned its verdict.

"The credibility of witnesses and the weight to be given to their testimony is a matter for the trial court, which is free to believe none, part, or all of their testimony." *Smotherman*, 499 S.W.3d at 711 (citing *Herbert v. Harl*, 757 S.W.2d 585, 587 (Mo. banc 1988)). "The trial court is in a superior position to determine the credibility of witnesses, and this Court defers to those determinations." *Id.* (citing *State v. Johnson*, 207 S.W.3d 24, 44 (Mo. banc 2006)). Because the trial court could have rejected the credibility of the Defendants' affidavits, the Defendants have not sustained their burden to establish that juror misconduct occurred. Without a predicate finding that juror misconduct occurred, the Defendants' claims of error regarding the trial court's failure to presume prejudice and the failure to shift the burden of disproving prejudice to Harned are rendered moot. *See Smotherman*, 499 S.W.3d at 712.

Even if the trial court believed that the Challenged Juror improperly gathered evidence concerning Ativan's side effects during the trial, and that her research constituted misconduct, Harned sufficiently rebutted the presumption of prejudice because the extraneous evidence was not material to the consequential facts of this case.

Defendants claim that "[t]he fact that [Dr. Spurlock] discharged Harned on Ativan, *rather than* some other unspecified medication, was a material fact in the case" and that from the Challenged Juror's research, "the jury would have been free to conclude that

11

[Harned's] hallucinative [sic] description of the fire and her conduct in causing the fire was a deleterious side effect of the Ativan prescription that she was on at the time of her discharge and, thus, impermissibly permitted the jury to find liability based on extrinsic evidence that Defendants had no means or opportunity to rebut." (Emphasis added). There are two problems with Defendants' contention.

First, Harned's central claim was that Dr. Spurlock was negligent in deciding to discharge Harned to an inappropriate level of care and without an adequate safety plan. Relevant to that claim were the medications Harned was prescribed upon her discharge. Harned argued that it was inappropriate to discharge her to her mother's care with *only* a prescription of low-dose Ativan, and that she should also have been prescribed additional psychiatric medications. Harned never argued that she should not have been prescribed Ativan. Even the portion of Dr. Jayaram's expert testimony upon which Defendants rely indicates that the relevant issue was whether Harned should have been prescribed psychiatric medications in addition to the low-dose Ativan.[4] Consistent with the evidence,

---

[4]Defendants rely on the following testimony by Dr. Jayaram:

> [Harned's counsel]: Doctor, [Harned] was not given any medications on her way out, right?
>
> . . . .
>
> [Dr. Jayaram]: Correct, . . . other than Ativan.
>
> [Harned's counsel]: Psychiatric medications, what do you think about that?
>
> [Dr. Jayaram]: Well, that's not typical. So[,] if the patient has a primary disorder such as bipolar illness, she needs to be on a mood stabilizer. She needs to be on an antipsychotic if she's had psychotic symptoms. Neither one of those were prescribed.
>
> [Harned's counsel]: Doctor, but he's just the consulting physician. He's not taking over her care, right?

12

each of the four jurors in Harned's counter affidavits explained that the existence of an Ativan prescription, or its potential side effects, did not influence their deliberations because Harned was not complaining about the fact that she had been prescribed Ativan, and was only complaining that she should have been prescribed something in addition to Ativan.

Second, nothing in Harned's description of her August 8, 2016 suicide attempt suggests that she was suffering from hallucinations. Defendants fail to cite to any portion of the record suggesting hallucinations played any role in Harned's August 8, 2016 suicide attempt. Any extraneous evidence pertaining to Ativan having the side effect of causing hallucinations was not material to the consequential facts of this case.

If juror misconduct occurred as alleged, the presumption of prejudice has been overcome because the extraneous evidence alleged by the Defendants was not material to consequential facts in the case. The trial court did not error in denying Defendants' claim of juror misconduct.

Point One is denied.

**Point Two: Defendants have not preserved their claims of error regarding the trial court's submission of Instruction No. 8, the verdict director.**

In their second point on appeal, Defendants assert that the trial court committed error in submitting Instruction No. 8, Harned's verdict director, because it was vague, unsupported by the evidence, and gave the jury a roving commission to determine liability.

---

[Dr. Jayaram]: Doesn't matter. So[,] if you walk into my office and I interviewed you, you are my patient. It doesn't matter if I'm going to be seeing you a year later or not. I am responsible for you at the time I see you and evaluate you. I'm responsible for your complete care and disposition.

"Whether a jury was properly instructed is a question of law subject to *de novo* review." *Williams v. City of Kansas City*, 641 S.W.3d 302, 325 (Mo. App. W.D. 2021) (citing *Williams v. Mercy Clinic Springfield Communities*, 568 S.W.3d 396, 413 (Mo. banc 2019)). "Instructional error is grounds for reversal only when the instruction misdirected, misled, or confused the jury and resulted in prejudice that materially affected the merits of the case." *Id.* at 325-36 (citing *Williams*, 568 S.W.3d at 413). "Our review is conducted in the light most favorable to the submission of the instruction." *Id.* (citing *Williams*, 568 S.W.3d at 413).

Instruction No. 8 directed the jury to assess a percentage of fault to Defendants if it believed:

First, [Dr. Spurlock] and [Meritas] either[:]

failed to adequately assess [Harned's] risk for suicide, or

decided [Harned] should be discharged on July 25, 2016, or

failed to transfer [Harned] for inpatient psychiatric treatment[,] or

***failed to arrange the appropriate level of psychiatric care for [Harned] upon discharge,*** or

failed to develop a psychiatric treatment plan for [Harned], or

***failed to provide [Harned] with the appropriate psychiatric medications***[,] or

failed to develop an adequate safety plan for [Harned], and

Second, [Dr. Spurlock] and [Meritas] in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to [Harned].

14

(Emphasis added). Defendants claim it was error to include the emphasized fourth and sixth submissions ("Fourth Submission; Sixth Submission") in the verdict director. In their point relied on, Defendants argue that the Fourth and Sixth Submissions were vague, unsupported by the evidence and a roving commission because "there was no evidence . . . that the standard of care required something other than inpatient transfer," (in reference to the Fourth Submission), "and no evidence regarding the exact medication Harned should be discharged on" (in reference to the Sixth Submission).

Before addressing the merits of Defendants' second point on appeal, we address whether the multiple errors therein claimed have been preserved for our review. We conclude that they have not been preserved for our review for several reasons.

Defendants' second point on appeal is impermissibly multifarious in violation of Rule 84.04(d), in that it raises multiple, divisible claims of error by challenging two separate submissions in the verdict director. "Multifarious points relied on are noncompliant with Rule 84.04(d) and preserve nothing for review." *All Star Awards & Ad Specialties, Inc. v. HALO Branded Sols., Inc.*, 642 S.W.3d 281, 294 (Mo. banc 2022) (quoting *Macke v. Patton*, 591 S.W.3d 865, 869 (Mo. banc 2019)); *see also Meadowfresh Sols. USA*, 586 S.W.3d at 341-42 (dismissing three points on appeal which each combined "multiple allegations of instructional error into a single point relied on"); *Penzel Constr. Co., Inc. v. Jackson R-2 Sch. Dist.*, 635 S.W.3d 109, 127 n.6 (Mo. App. E.D. 2021) ("raising multiple legal reasons supporting a claim for reversible instructional error is impermissibly multifarious under Rule 84.04(d)(1)." (citation omitted)).

15

Further complicating matters, as to each of these divisible claims of error, the point on appeal assert more than one legal reason for claiming error by arguing both that the submissions are vague and a roving commission, and that the submissions are unsupported by the evidence. "In order for disjunctive verdict directing instructions to be deemed appropriate, each alternative must be supported by substantial evidence." *Ross-Paige v. Saint Louis Metro. Police Dep't*, 492 S.W.3d 164, 172 (Mo. banc 2016) (quoting *Herrington v. Medevac Med. Response, Inc.,* 438 S.W.3d 417, 422-23 (Mo. App. W.D. 2014)). Thus, a claim that a disjunctive submission in a verdict director is unsupported by the evidence is not an objection to the form or language used in the submissions, and is instead directed to whether the submission can be tendered at all. In contrast, an objection that a disjunctive submission is so vague as to create a roving commission is an objection to the *form* of the submission, and not to whether the submission is supported by substantial evidence. "A roving commission occurs when an instruction . . . submits an abstract legal question that allows the jury to roam freely through the evidence and choose any fact which suit[s] its fancy or its perception of logic to impose liability." *Williams*, 568 S.W.3d at 413 (quoting *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 766 (Mo. banc 2010)). "[A] jury instruction may be considered a roving commission 'when it is too general or where it submits a question to the jury in a broad, abstract way without any limitation to the facts and law developed in the case.'" *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 396 (Mo. App. E.D. 2014) (citing *Coon v. Dryden*, 46 S.W.3d 81, 93 (Mo. App. W.D. 2001)).

We elect to overlook Defendants' identification of more than one legal reason for challenging the Fourth and Sixth Submissions in their point relied on, because in explaining

16

"why" the submissions are both "unsupported by the evidence" and "vague and a roving commission," the point relied argues only that "no evidence" supported a finding that the standard of care required something other than inpatient transfer," (in reference to the Fourth Submission), and that "no evidence" identified the exact medication Harned should have been prescribed (in reference to the Sixth Submission). In other words, Defendants' point on appeal argues that the Fourth and Sixth Submissions are both vague and a roving commission and unsupported by the evidence because "no evidence" supported their submission.

Still, there is an additional concern with the point relied on. To obtain reversal based on instructional error, Defendants have the burden of demonstrating "that the offending instruction misdirected, misled, or confused the jury, ***resulting in prejudice to the party challenging the instruction***." *Kader v. Bd. of Regents of Harris-Stowe State Univ.*, 565 S.W.3d 182, 186 (Mo. banc 2019) (emphasis added) (quoting *Ross-Paige*, 492 S.W.3d at 172). Defendants' point relied on includes no assertion of prejudice, resulting in a failure to preserve any claim of prejudice for our review. *Reed v. Kansas City Mo. Sch. Dist.*, 504 S.W.3d 235, 244 (Mo. App. W.D. 2016). To the extent prejudice is addressed in the argument portion of Defendants' brief, the argument is not preserved because "[u]nder Rule 84.04(e), an appellant shall limit argument to those errors included in the points. 'We do not consider an argument not preserved in the Point Relied On.'" *Id.* (quoting *Frazier v. City of Kansas City*, 467 S.W.3d 327, 340 (Mo. App. W.D. 2015)).

Even if we overlook the preservation issues associated with Defendants' second point on appeal, Defendants would face the additional hurdle of not having preserved at

17

trial the specific claim of error raised on appeal. To preserve a claim of instructional error for appellate review, the specific objection raised on appeal "must [have] be[en] made [at trial] stating distinctly the matter objected to and the grounds of the objection. The same objection must also be raised in the motion for a new trial." *Wynn v. BNSF Ry. Co.*, 588 S.W.3d 907, 912 (Mo. App. W.D. 2019) (quoting *Joseph F. Wagner, Jr. Revocable Tr. v. Thomson*, 586 S.W.3d 273, 280-81 (Mo. App. W.D. 2019)).

At trial, Defendants' initial objection to the Fourth and Sixth Submissions was the same--that the submissions were "vague and ambiguous and [gave] the jury a roving commission." Concerning the Fourth Submission, which instructed the jury to determine whether Defendants "failed to arrange the appropriate level of psychiatric care for [Harned] upon discharge," Defendants argued at trial that the submission created a roving commission because "there are the four levels of care mentioned by Dr. Jayaram. I have no idea . . . which of those four 'the' is referring to." Defendants *neve*r objected at trial that the Fourth Submission was supported by no evidence as is argued in their point on appeal. That claim of error is not preserved for our review.[5]

Concerning the Sixth Submission, which instructed the jury to determine whether Defendants "failed to provide [Harned] with the appropriate psychiatric medications," the Defendants first argued at trial that the submission created a roving commission because it

---

[5]This conclusion is further warranted by the fact that in the argument portion of their brief, Defendants contend that "[i]f [the Fourth Submission] sought to hypothesize a basis of fault by some means [] *other than* an inpatient admission, the submission lacks any support in [Harned's] evidence." (Emphasis in original). That argument was not made to the trial court nor raised in the Motion for New Trial. Defendants alternatively contend in the argument portion of their brief that if the Fourth Submission was meant to hypothesize fault based on Defendants' failure to arrange an inpatient admission at discharge, "then the submission impermissibly gave a roving commission because the submission is redundant to [the preceding submission]." Defendants never raised this argument at trial or in their Motion for New Trial.

18

did not identify what medication was "appropriate." The trial court responded by noting that Dr. Jayaram had testified that a mood stabilizer should have been prescribed, but also invited Defendants to suggest more specific language besides the word "appropriate." Defendants offered no alternative to the form of the Sixth Submission. Instead, after being invited by the trial court to suggest more specific language than the word "appropriate,"[6] Defendants explained that "[their] position is [that] Dr. Jayaram *did not give causation testimony* to connect it anyway. She talked about inpatient being what would be preventative. So[,] we do not have an alternative language to [propose] because we don't think it should be submitted."

This additional objection did challenge whether the Sixth Submission was supported by the evidence. However, the objection was based on the alleged absence of causation testimony to connect additional medication to prevention of Harned's later suicide attempt. That issue has not been raised by Defendants on appeal. Instead, Defendants now argue that the Sixth Submission was supported by "no evidence" because Dr. Jayaram did not state the exact medication that should have been prescribed to Harned consistent with the standard of care.

Because Defendants have not raised on appeal the only objection raised at trial regarding the sufficiency of the evidence to support the Sixth Submission, and because

---

[6]It is worth noting that decisional law would not support a conclusion that use of the word "appropriate," without more, in either submission would have required us to conclude that the submissions created roving commissions. *See Williams v. Daus*, 114 S.W.3d 351, 370-71 (Mo. App. S.D. 2003) (holding that a verdict director submission that a defendant physician breached the standard of care by "perform[ing] a surgery without proper indication" was not a roving commission given the specificity of expert testimony admitted at trial). "When determining whether a roving commission occurred, a jury instruction should be considered in the context of the trial as a whole." *Williams v. Mercy Clinic Springfield Communities*, 568 S.W.3d 396, 414 (Mo. banc 2019) (citing *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 767 (Mo. banc 2010)).

19

Defendants did not raise at trial the specific objection to the sufficiency of the evidence now raised on appeal, the claim of error regarding the Sixth Submission is not preserved for our review.

Point Two is denied.

**_Point Three: The trial court did not err in prohibiting Defendants from cross-examining Dr. Jayaram about whether non-party healthcare providers violated the standard of care because Defendants did not preserve this claim of error for appellate review, and because in any event, the evidence was likely to confuse and mislead the jury._**

In their third point on appeal, Defendants argue that the trial court erred in prohibiting Defendants from asking Dr. Jayaram whether non-party healthcare providers met the standard of care because this prevented Defendants from testing the accuracy and credibility of Dr. Jayaram's expert opinions.

The trial court "is granted considerable discretion in deciding whether to admit or exclude evidence" and its ruling will not be disturbed absent clear abuse of discretion. *Rhoden v. Mo. Delta Med. Ctr.*, 621 S.W.3d 469, 483 (Mo. banc 2021) (quoting *Williams*, 568 S.W.3d at 416). "During cross-examination of an expert witness, parties are 'given wide latitude to test qualifications, credibility, skill or knowledge, and value and accuracy of opinion;'" however, the trial court "is given discretion in limiting the scope of such cross-examination of witnesses to exclude evidence that is too remote, misleading, confusing, or cumulative." *Revis v. Bassman*, 604 S.W.3d 644, 652 (Mo. App. E.D. 2020) (quoting *Montgomery v. Wilson*, 331 S.W.3d 332, 341 (Mo. App. W.D. 2011)) (citing *Robinson v. Empiregas Inc. of Hartville*, 906 S.W.2d 829, 840-41 (Mo. App. S.D. 1995)).

20

In a pretrial deposition, Dr. Jayaram testified that Harned's other medical providers had "not reported any effort to change the course of [Harned's] illness or treatment or to diminish her suffering," and that every physician who saw Harned but failed to treat her bipolar disorder or refer her for substance abuse treatment fell below the standard of care. Prior to trial, Harned filed a motion *in limine*, which sought to exclude any discussion of whether non-party medical providers who treated Harned met the standard of care. The trial court granted Harned's motion *in limine*.

"The trial court's ruling on a motion *in limine* is interlocutory and subject to change during the course of trial." *Ratcliff v. Sprint Mo., Inc.*, 261 S.W.3d 534, 551 (Mo. App. W.D. 2008) (citation omitted). "The proponent of the evidence must attempt to present the excluded evidence at trial" and "[i]f the trial court continues to exclude the evidence, the proponent must then make an offer of proof." *Id.* (quoting *Hancock v. Shook*, 100 S.W.3d 786, 802 (Mo. banc 2003)). A sufficient offer of proof must include: "(1) what the proffered evidence would be; (2) its object and purpose; and (3) all the facts necessary to establish its relevance and admissibility." *Westmoreland v. Midwest St. Louis, LLC*, 623 S.W.3d 618, 637 (Mo. App. E.D. 2021) (quoting *Menschik v. Heartland Reg'l Med. Ctr.*, 531 S.W.3d 551, 562 (Mo. App. W.D. 2017)). "The purpose of making such an offer is to inform the trial court about the content of the proffered evidence and to allow an appellate court to assess the prejudicial effect of the exclusion." *Id.* (citation omitted). "[A]n . . . offer of proof must be made so the trial court has the opportunity to consider such circumstances and developments and thus be enabled to make a reasoned and fully advised

21

decision."  *Id.* (quoting *Evans v. Wal-Mart Stores, Inc.*, 976 S.W.2d 582, 584 (Mo. App. E.D. 1998)).

Defendants contend that they preserved their claim of evidentiary error for our review because "after the trial court made its ruling on admissibility of this evidence, Defendants made several offers of proof regarding the ruling."  We disagree.

When Dr. Jayaram testified at trial, Defendants never attempted to ask for her opinions about whether Harned's non-party medical providers breached the standard of care.  As a result, while Dr. Jayaram was on the stand, Defendants never asked the trial court to reconsider its pretrial ruling, never sought to admit the evidence about which they now complain, never secured a ruling from the trial court excluding the evidence about which they now complain, and did not make an offer of proof.

After Dr. Jayaram was released as a witness, and after the ***next*** witness's video deposition was presented to the jury, Defendants made the following statement, in apparent reference to Dr. Jayaram:

> Another motion *in limine* ruling that you made is that questions about ***whether other providers who discharged or didn't prescribe mood stabilizer, etc., fell below the standard of care was excluded.*** She did say that in her deposition. So, I've marked for identification -- not obviously offering it as an exhibit, her entire transcript is [exhibit] 177. My offer of proof is if asked the same questions at trial as in her deposition, she would have answered the same way.  That's it.

It is this "statement" that Defendants' characterize as their "offer of proof."  This "offer of proof" was not sufficient however, to preserve the claim of error raised in Defendants' third point on appeal.  The "offer of proof" was untimely, it failed to explain to the trial court the object and purpose of the "excluded" testimony, it failed to set forth any facts which

22

would establish the relevance and admissibility of the "excluded" testimony, and it never asked the trial court to reconsider its pretrial ruling. As a result, the trial court never made a ruling at trial excluding Dr. Jayaram's testimony about whether Harned's non-party medical providers met the standard of care. Defendants cannot claim error in the exclusion of evidence that was never offered. *See Hancock*, 100 S.W.3d at 802 (holding that to properly challenge the exclusion of evidence at trial, a party must first attempt to present the evidence); *see, e.g., Westmoreland*, 623 S.W.3d at 636-37 (holding that where trial court never made a ruling excluding evidence but instead repeatedly insisted on the laying of a proper foundation before evidence would be admitted, the trial court could not be accused of wrongfully excluding evidence, especially in the absence of an appropriate offer of proof). The evidentiary error raised in the third point on appeal has not been preserved for our review.

Even if we generously credit Defendants with having preserved their claim of error, (which they did not), we would not find that the trial court abused its discretion in excluding Dr. Jayaram's opinions about whether non-party medical providers who treated Harned met the standard of care. The jury heard Dr. Jayaram testify about the steps that had been taken (or not) by Harned's non-party healthcare providers, as Dr. Jayaram addressed Harned's prior treatment history. For example, Dr. Jayaram testified that on June 30, 2016, a non-party physician prescribed Harned several antipsychotics and anti-anxiety medications, one of which was the prescription drug Harned attempted to overdose on, resulting in her admission to Liberty Hospital on July 23, 2016. Dr. Jayaram testified on cross-examination that there were "multiple prior occasions" where Harned was hospitalized, evaluated and

23

then discharged to outpatient care. Defendants' counsel went through medical records with Dr. Jayaram that established that Harned was hospitalized but discharged to outpatient care at least four times prior to her hospitalization at Liberty Hospital in July 2016. Dr. Jayaram agreed that Harned had been in and out of psychiatric care, often for short hospitalizations, and that "care wasn't always well-rendered." The *only* testimony that the jury did not hear were Dr. Jayaram's ultimate opinions about whether Harned's non-party medical providers met the standard of care.

That evidence was properly excluded. "Generally, courts have ruled that evidence of the negligence of other persons not before the court is not admissible." *Bella v. Turner*, 30 S.W.3d 892, 897 (Mo. App. S.D. 2000) (citation omitted) (trial court did not abuse its discretion when it excluded testimony discussing whether a non-party physician "was also negligent, as such testimony might be confusing to the jury" and "[p]lacing it under the label of cross-examination as to the standard of care does not change what it would have presented to the jury."). "Where concurrent or successive negligence combined together results in injury, the injured party may recover damages of either or both, and neither can use the defense that the prior occurrence or negligence of the other contributed to the injury." *Tillman by Tillman v. Elrod*, 897 S.W.2d 116, 118 (Mo. App. S.D. 1995) (citations omitted).

Moreover, we are not persuaded that the excluded evidence was admissible "to show that Dr. Jayaram's version of the standard of care is faulty and not the true standard of care," as Defendants now claim. Though neither the motion *in limine*, nor the arguments in support or in response, are included in the record on appeal, the trial court's ruling on the

24

motion *in limine* was referenced during closing argument after Harned objected to Defendants' reference to "other physicians [actions] who saw the same patient:"

> I think the ruling on the motion *in limine* was that we're not going to talk about the standard of care with the other doctors, whether or not they met it, and I think I specifically said that we could discuss the fact that she went to the hospital and that she was discharged, but since the incidents were different, we can't compare one standard of care to another standard of care because these weren't all suicide attempts. If they were suicide attempts that were the same, I think that would be appropriate, but since they were not all the same, the standard of care and what -- how the doctors chose to treat her would have been different. That's my understanding of the ruling that I made on the motion *in limine*.

The trial court's comments underscore that Dr. Jayaram's opinions about whether non-party medical providers met the standard of care were properly excluded because the testimony would confuse and mislead the jury on the issue of Dr. Spurlock's standard of care. *See Bella*, 30 S.W.3d at 897.

Even presuming the claim of error raised in Defendants' third point on appeal was preserved by an appropriate offer of proof, which it was not, the trial court did not err in excluding Dr. Jayaram's opinions regarding whether non-party healthcare providers met the standard of care while treating Harned.

Point Three is denied.

***Point Four: The trial court did not err in denying Defendants' Motion for Remittitur because its finding that Harned suffered irreversible failure of her skin was supported by competent evidence permitting application of the catastrophic personal injury cap for noneconomic damages.***

In their fourth point on appeal, Defendants argue that the trial court erred in denying their Motion for Remittitur because the trial court applied a higher catastrophic personal

injury noneconomic damages cap than permitted by statute as the evidence did not establish that Harned suffered irreversible failure of a major organ system.

Our review of a trial court's denial of a motion for remittitur is for abuse of discretion. *Ordinola v. Univ. Physician Assocs.*, 625 S.W.3d 445, 453 (Mo. banc 2021). "The authority to choose, after careful deliberation, between two reasonable alternatives, both of which are supported by the evidence, is the essence of discretion." *Id.* (quoting *O'Brien v. Dep't of Pub. Safety*, 589 S.W.3d 560, 566 n.11 (Mo. banc 2019)).

Section 538.210.2(1) limits a plaintiff's recovery "against a health care provider for damages for personal injury arising out of the rendering of or the failure to render health care services" to $400,000 for noneconomic damages, irrespective of the number of defendants. However, section 538.210.2(2) provides that notwithstanding section 538.210.2(1), a plaintiff may recover $700,000[7] for noneconomic damages irrespective of the number of defendants where there are "damages for a catastrophic personal injury arising out of the rendering or failure to render health care services" ("catastrophic personal injury cap"). A "catastrophic personal injury" is defined as a physical injury resulting in:

(a) Quadriplegia defined as the permanent loss of functional use of all four limbs;

(b) Paraplegia defined as the permanent loss of functional use of two limbs;

(c) Loss of two or more limbs;

(d) An injury to the brain . . . ;

---

[7]The damage caps for noneconomic damages set forth in sections 538.210.2(1) and 538.210.2(2) are subject to an annual inflation adjustment, as described in section 538.210.10.

(e) An injury that causes *irreversible failure of one or more major organ systems*; or

(f) Vision loss . . . .

Section 538.205(1) (Emphasis added).  The parties agree that subparagraph (e) is the only category of "catastrophic personal injury" that has potential application to Harned's burn injuries.

"Major organ systems" is not defined in section 538.205.  However, Defendants do not dispute that the skin qualifies as a major organ system.[8]  Defendants also do not dispute that Harned suffered third-degree burns to a substantial portion of her body.  Defendants argue, however, that the injuries to Harned's skin did not result in an "irreversible failure" of this major organ system because evidence at trial established that skin grafts have healed Harned's skin over time.  Defendants acknowledge that Dr. Bhavsar testified that "Harned will have some level of *permanent contracting, scarring, discomfort, and loss of function*" of her skin, but contend that Dr. Bhavsar "never testified that there was an irreversible failure of [Harned's] skin." (Emphasis added).

Defendants rely heavily on *Ordinola v. University Physician Associates*, 625 S.W.3d 445, 453 (Mo. banc 2021), where there was competing evidence from two doctors about whether plaintiff suffered irreversible failure of her bladder.  The plaintiff's doctor testified that plaintiff "suffered a complete, irreversible failure to her bladder and urinary organ system." *Id*.  The defendant's doctor testified in rebuttal that "multiple surgeries may

---

[8]"The integumentary system is the largest organ of the body that forms a physical barrier between the external environment and the internal environment that it serves to protect and maintain." *Integumentary System*, Physiopedia, https://www.physio-pedia.com/Integumentary_System.  The integumentary system includes skin (epidermis, dermis); hypodermis; associated glands; hair and nails. *Id*.

prove effective in repairing [the plaintiff's] fistula, thereby reversing the alleged organ system failure." *Id*. The Missouri Supreme Court held that the trial court did not abuse its discretion in weighing the competing evidence to conclude that the catastrophic personal injury cap applied. *Id*.

Defendants misread *Ordinola* to hold that an expert must expressly opine that a plaintiff's injuries resulted in an irreversible failure of a major organ system as a condition of applying the catastrophic personal injury cap described in section 538.210.2(2). That is not what *Ordinola* holds. Rather, *Ordinola* simply reinforces that in the exercise of discretion, a trial court has "[t]he authority to choose, after careful deliberation, between two reasonable alternatives, both of which are supported by the evidence." *Id*. (quoting *O'Brien*, 589 S.W.3d at 566 n.11). The issue in Harned's case, therefore, is not whether Dr. Bhavsar used "magic language" to issue a summative opinion that Harned suffered irreversible failure of a major organ system, but instead whether Dr. Bhavsar's testimony supports the conclusion that Harned suffered irreversible failure of a major organ system. We conclude that it does.

As a result of her August 8, 2016 suicide attempt, Harned suffered third-degree burns over forty-two percent of her body, including to her face, neck, torso, arms, and legs. Dr. Bhavsar, testified that third-degree burns are those where the "entire thickness of the skin is involved, or near complete thickness of the skin is involved, and . . . ***the skin cannot heal itself***." (Emphasis added). This testimony alone supports a conclusion that Harned suffered irreversible failure of a major organ system.

28

It is true that the irreversible failure of Harned's skin was subject to medical intervention in the form of numerous surgical skin grafts and laser procedures. In fact, Dr. Bhavsar testified that the surgical treatments of Harned's skin were "a matter of life and death." In other words, but for surgical intervention, Harned would likely have died.

Though Harned's multiple surgical interventions spared her from death, they did not heal her failed skin, or restore her skin's ability to heal itself. Instead, Harned's multiple surgeries accommodated Harned's failed major organ system by removing dead and charred skin and replacing it with cadaver skin, allowing Harned to survive a major organ failure. Even then, Harned required extensive, long-term rehabilitation in order to regain some function and her "ability to live more normally." Harned was left with hypertrophic scarring on her neck, arms, thighs, torso, and abdomen which results in "extensive itching, pain, . . . hypersensitivity to heat, cold, and sometimes breaking of the scars because the skin" does not "behave [] normally" and it is subject to deterioration. Harned also experienced contracture, or the restriction of her scarring, which is painful and decreased her ability to move her head, neck, and extremities. Dr. Bhavsar testified that the contracture and scarring left Harned with ***permanent*** mobility issues, functional loss, discomfort, nerve damage, and increased sensitivity to sun exposure.

This evidence was more than sufficient to support a conclusion that Harned suffered irreversible failure of her skin, a major organ, as to support application of the catastrophic personal injury cap. We reject Defendants' contention that the skin grafts "healed" Harned's skin. Rather, the evidence established that a major organ systems--Harned's skin--irreversibly failed and could not heal itself, but that Harned was able to survive due to life-

29

saving medical intervention that accommodated for the irreversibly failed major organ system.

The trial court did not abuse its discretion in overruling Defendants' Motion for Remittitur.

Point Four is denied.

## Conclusion

The trial court's Judgment is affirmed.

_Cynthia L. Martin_
_____
Cynthia L. Martin, Judge

All concur